Welcome to the Fourth Circuit. We have two cases on for hearing this morning. The first one is 22-4519, United States v. Canada. This is Mr. McBeth. Thank you and good morning, Your Honors. My name is Colin McBeth, and along with my co-counsel, Louis Lang, I represent the appellant, Zavien Canada. I'm going to address the Second Amendment issue, and then Mr. Lang is going to address the ACCA issue. Your Honors, the Supreme Court's decision last year in Bruin fundamentally changed how courts decide Second Amendment issues. Rather than balancing means and ends, courts begin by asking whether a challenger and his conduct are covered by the plaintext of the Second Amendment. If they are, then a law burdening that conduct is presumptively unconstitutional, and the government bears the heavy burden of showing, through rigorous engagement with founding-era statutes, that the law is consistent with America's tradition of firearms regulation. Under this new framework, 18 U.S.C. 922 G-1 is unconstitutional. Can I ask, so isn't, you're making a facial challenge to the statute, isn't that right? Yes, Your Honor. So don't you have to show that under any circumstance, you know, the statute would be unconstitutional? There's no circumstance where the statute would be constitutional? That's correct, Your Honor. So how can you do that in this case? What that means in the context of a Second Amendment challenge is, if there's no tradition of a particular kind of regulation, then that regulation in the modern day cannot be applied to anyone constitutionally. Look at the way the statute is written, and if there's not a historical tradition of that kind of statute, then it can't be applied constitutionally in any circumstances. In other words, in Bruin, the court looked at the statute as it's written on its face and said, there's nothing like this on the books, therefore the statute is unconstitutional. It's not about whether, and in fact, the dissent talked in Bruin about how we should remand this case to the district court or to the Second Circuit, I guess, for factual findings about how the regime was actually implemented in practice, and the Supreme Court said, no, we don't need to do that because this is essentially a facial inquiry. So before we continue with that, can I just confirm, I think I know the answer, but can I confirm you are not making an as-applied challenge of any sort? That's correct, yes. This is a facial challenge. I understand what you're saying about Bruin, but it does seem as though the issue that is now kind of live in the courts of appeals is about these as-applied challenges and whether the statute can be applied to non-dangerous felons. Is there any circuit support for the idea that this, and there's a circuit split on that question, is there any circuit authority for the proposition that this law is facially unconstitutional and cannot be applied to dangerous felons? No, so there's no circuit court opinion saying that. I think only maybe four circuits have a real depth of case law. There is at least one court in the Northern District of Illinois that has said the statute is facially unconstitutional. We cited that case in our 28-J letter. Can I ask you a question about that? So that court relied, as I understand it, on, you know, under Bruin, when we're doing the analogizing, we look to both why and how, and that court fought on the why side, this was fine, but on the how side, there was no analogy because the how of the burden, here it is a lifelong burden, and at the founding, some of the groups that were kind of categorically disarmed could get back the right to own a gun, right? Okay. That's not an argument you made in your brief, right? No, it is, Your Honor. We talked about, I mean, the government cited several historical analogs, and we, for instance, loyalty oath statutes. We pointed out in our reply brief those are not analogous to 922G1 because under those statutes, someone could regain their right to arm simply by swearing an oath. There's something like that in 922G1, as you just said, it is a categorical, permanent ban. Well, no, I didn't say that. The district court said that. It actually doesn't strike me. I mean, there are ways you can regain the right to own. So there are, in theory, but they are extremely narrow, difficult, and not in any meaningful sense within the control of the person who's trying to get his arms right back. So it's true, you can apply for a pardon, but that is a matter of grace. Thousands and thousands of people apply for pardons every year. It's very hard to get one. There's no guarantee you can do it. That is just not at all the same as a regime under which all you have to do to get your arms right back is go down to, you know, City Hall or whatever and swear an oath. That is entirely within your control. You can get your arms right back whenever you want. So I don't think the burden there is really at all comparable to the burden under the loyalty oath statutes. Can I ask you about the threshold problem that you just sort of skipped entirely over? So this case was before us once previously, right? Correct. And so factually speaking, your client had a district court proceeding which he never said boo about the Second Amendment. He had a previous appeal where he never said boo about the Second Amendment. So I want to give you a counterfactual. If in his first appeal he had raised the Second Amendment, we would have 1,000 percent reviewed that under Federal Rule of Criminal Procedure 52B, right? Correct. How can your client possibly be better off given that he got a Rogers remand? I don't understand how this is a mousetrap solution that gets him out of the plain air standard that would have applied had he raised this during his first appeal. Because there's an exception to the mandate rule for changes. I'm not talking about the mandate rule. I'm talking about Federal Rule of Criminal Procedure 52B. Right. But this is a different appeal. I mean, once the case goes back to district court and he raises But 52B is not in the Federal Rules of Appellate Procedure. It's in the Federal Rules of Criminal Procedure. This was forfeited when it wasn't raised during the initial guilty plea, right? Well, Your Honor, if that were how, if Rule 52B did that to issues that are raised for the first time on remand, then this exception, I mean, the point of the mandate rule is if you don't raise it the first time, it's waived and there are exceptions to that. Okay. I just want to get set back. Why is it not conceptually bizarre to say that your client is better off because he didn't raise a Second Amendment challenge during his first appeal? That just seems bizarre. I understand it seems counterintuitive, but if Not counterintuitive. It seems profoundly strange. But if Rule 52 overrode the mandate rule exception in every case, then the exception would have no application. That's not true at all. You might win under Rule 52. So let me give you the counterfactual. I'm going to ask the government. Imagine that Bruin literally invalidated this statute, that Bruin said this statute is unconstitutional. Like that was the holding. It was United States versus Bruin. And the holding was that this statute is unconstitutional. It strikes me the right way you would deal with that is you would say you're subject to plain error review and lucky for you, you'll win because there was an error. It was clear, obvious under current law. You can show an impact on your substantial rights and you can satisfy prong for so you'd win. But that doesn't mean you're not subject to Rule 52 B. Right. That's I mean, that's part of the initial appeal, right? This is this is a new appeal. The again, the exception is is a situation in which the rules that you waive issues not raised doesn't apply. How do we have the authority to make an exception to Rule 52 B? Well, Your Honor, I mean, I I think that ship has sailed. The mandate rule has has been the law for and the exceptions have been the law for. But why isn't the answer you have to satisfy both Rule 52 B and the mandate rule? Not getting the mandate rule means you don't have to satisfy 52 B. Well, 52 B is a standard of appellate review. And when you raise an issue. Well, no, it's not. It's in the Federal's criminal procedure. It's not in the Federal's appellate procedure. District courts have to apply Rule 52 B. Well, I mean, you agree district courts have to apply 52 A, right? I'm sorry, I forget what 52 A is. 52 A is harmless error. Like a district court deciding whether to grant a motion for new trial is required under 52 A to ask whether any error was harmless, right? I mean, I think that's part of the new trial standard itself. I don't think that's a 52 A standard. You can't grant a new trial if the error didn't wasn't in some way prejudicial. I am not aware of case law from this court or any other saying that district courts have to apply Rule 52 B on remand or really in any other circumstance. I'm just not aware of those cases. So can I ask you, so I agree Kennedy is your best case, which with all respect, Kennedy says a lot of things, a lot of which in Kennedy strikes me as obviously dicta. But okay, so in Kennedy, the defendant objected to this sentencing enhancement during his first district court proceeding, correct? I don't think that's, I mean, if that's in the opinion, I missed it. I don't think he did. Do you know, okay, can you affirmatively cite to me any case where we've allowed a defendant who did not object during the first district court proceeding to sort of get around all principles of forfeiture like this? No, I can't cite a case like that, your honor. But again, the rule is written that the mandate rule applies when an issue is waived because it's not raised in district court. Then there are exceptions to that rule. We agree the mandate rule itself applies in this case. We've never argued that. But the exception allows you to get around that rule for when an issue is not raised. If there's no way to get around that rule, then it's not subject to exceptions. And we think the exception here is the change in law. So I mean, unless the court is going to say that exception just... Counselor, are you conceding that the exception, I mean, like my colleague, I am just completely confused by kind of the intersection of forfeiture rules and the mandate rule and the way we have blurred those two things together. And I agree with you. We have blurred those two things together. Our case law is difficult for me to rationalize and understand. But I hear you today at least saying that you are relying, to the extent we're talking about mandate rules and the exceptions to the mandate rule, you are relying only on the exception for a dramatic change in the law and not on the exception for a blatant error and a miscarriage of justice. Correct. Okay. The one that sort of sounds in plain error review. You're not relying on that. You don't think you could win on plain error review. In light of what the government said in its response brief, we're no longer relying on that exception. But we do think the change in law exception applies. And to go back to the point about Rule 52, I mean, the court in Kennedy also said that the mandate rule didn't even apply at all because there was no way at the time of the first sentencing that the defendant in that case could have anticipated the McCulloch case. Well, that's like the third thing the court, the first thing the court in Kennedy said, which strikes me as absolutely right, is what are you talking about? We're sending this back for resentencing. Of course, a court that is going to resentence you has to apply current law in resentencing you. That's the first thing Kennedy says. And that strikes me as self-evidently right. Sure. And, Your Honor, you used the word dict earlier. I don't think the rest of the opinion is dicta. They're alternative holdings. And there is... So there's like four alternative holdings? There's plenty of case law that says alternative holdings and dicta are not the same thing. A court can have an issue, it's judgment on multiple bases, and that does not render one of them dicta over the other. So, you know, the idea that the mandate rule didn't apply in that case because the defendant could not have anticipated McCulloch is not consistent with the idea that Rule 52B precluded him from even raising the issue at all. I guess what's... Can you just... I will drop this after this question, I promise. Do you have any authority for the proposition that just because you satisfied the mandate rule, you're not subject to Rule 52B? Your Honor, I'm not aware of any case that has ever addressed that question one way or the other. It's just the mandate rule cases do not discuss Rule 52. I mean, the problem is, at least... I will drop this too after this question. So a lot of our discussion of the mandate rule and the intervening case law decision... case law exception, very often that exception is being applied where the problem is that an issue was not raised on the first appeal. And then we say, well, that's an exception to the mandate rule, and it's basically the same exception for an appellate waiver. Like, if you try to raise something in a 28J letter that you didn't raise in your brief, we ask the same question. Is there some intervening decision that makes a previously unavailable argument now available? But I have the same kind of set of concerns as Judge Hyten's about applying that rule where there's been a kind of double forfeiture. It's not just that it wasn't raised on the first appeal. It's that it also wasn't raised before the district court the first time. Because while we have discretionary authority to just excuse the failure to raise it on court forfeiture, but you think we can effectively excuse that, too, because of the intervening decision? Yes. I mean, again, the change in law does have to be dramatic. This is not... I mean, I don't think, you know, to the extent the court is worried about opening up the floodgates here and allowing re-litigation of, you know, numerous issues that people could have raised the first time but didn't. I just don't think that's really going to be a concern. Bruin is a sort of a once-in-a-generation case that fundamentally changed the Second Amendment analysis. Oh, my gosh. I mean, just... Crawford, Booker... Johnson. I mean, we get these decisions all the time. Well, and Kennedy says if you couldn't have anticipated that the first time around, then you get to raise it. And even if the rule doesn't... even if the rule does apply, it still qualifies as an exception. I mean, I think... Does Kennedy say you couldn't have anticipated the decision or couldn't have anticipated the issue that led to the result? Because that... what I hear my colleagues saying is that somebody has to be the first Bruin, right? So why not your client? So I admit I'm not exactly sure which words the court in Kennedy used. As I read it, what the court was saying was this defendant could not have anticipated this argument about generic conspiracy being broader or narrower than the conspiracies... Well, he could not have... maybe could not have anticipated... I guess now I'm violating the promises my colleague made to you. You didn't promise anything. I couldn't have anticipated that it would be a winning argument, right? But somebody had to be the first. I think that's what the point is, that you don't get a free pass simply because you're piggybacking on arguments that you could have made yourself in the district court. That may have been what the court was saying, but even if that is what the court was saying, I think that same principle applies here. I mean, it was well established at the time of the first proceedings in this case that 922G1 in this court was subject to the presumptively lawful regulatory measures analysis from Chester, or sorry, from Moore. I mean, yes, in theory, Mr. Kennedy could have argued for this entirely new text and historical tradition argument and explained why 922G1 failed that analysis, but Kennedy says that kind of, you know, hypothetical possibility is not enough to hold against someone the fact that they didn't raise that argument the first time. Can I ask you a question? And I know you're over time, but I guess as long as we're talking, you can talk. So you probably, I would hope, have listened to the arguments or at least got a summary of the arguments in Rahimi, which seemed to suggest that the court was attempting to figure out a way to reconcile its Bruin historical analogy decision with the realities on the ground, including the realities of domestic violence orders. And of course, it's difficult sometimes to read tea leaves, but it seems, at least my view, is that it seems likely that the court may be poised to make an exception or at least apply Bruin in a way that validates the domestic violence order, if not broadly, at least narrowly in that case. Do you think that case, if it turns out that way, would inform the result here? So it might, depending on what the nature of the court's holding is. So first, the court might or might not address the scope of the people at the first step of Bruin. At the second step, if the court reverses, I mean, it could do so on a number of bases. One could be that there was no statute like 922G8 specifically at the founding, or sorry, that there were statutes similar to 922G8 at the founding. I don't know what those statutes would be, but perhaps the surety statutes that the government cited, things like that. Or it could announce a broader rule that some sort of, you know, dangerousness, untrustworthiness, whatever the standard is, is a proper metric. If that's true, then, you know, the parties in this case have not addressed whether 922G1 satisfies that standard, because at this point, no one knows what it means. I mean, the government has proposed untrustworthiness and dangerous, but has never really said what those standards mean or how you assess dangerousness. I mean, do you look at the elements of an offense? Do you look at how crimes are actually committed on the ground? Do you, you know, how far back in time? Are we talking about people who were dangerous 20 years after they committed their offense? There's no, we don't have metrics for deciding what dangerousness is. So I guess what I'm getting at is if the court is inclined to say, well, let's wait for Rahimi to shed some light on this, I think we would at least ask the court, once Rahimi comes out, for the chance to brief, you know, how whatever that new test is applies to 922G1. On a facial challenge, would it matter? I mean, whatever the test for dangerousness is, your argument would have to be it is impossible to be a dangerous felon, basically, to win on a facial challenge, right? No, so I think the analysis is the category of felons as a category characteristic of dangerousness. I mean, for instance, just to take a sort of thought experiment, I mean, left-handed people cannot possess guns, and surely there are some dangerous left-handed people out there, but I don't think this court would say, well, that statute is part of a historical tradition of banning dangerous groups from having firearms because dangerousness is not characteristic of left-handed people. I hope not, because I am. I hope not, too. So in other words, I think, you know, assuming for sake of argument that this dangerousness test is coherent and consistent with Supreme Court case law, there has to be at least some scrutiny of whether that group as a whole is characteristically dangerous. Otherwise, it's just not part of a tradition of dangerousness. It's just something else. Yeah, can I? I don't mean to lay this at your feet, but that just sort of reminds me of one of the problems I have with this case. At the point at which we're asking that question is the category felon sort of sufficiently tied to dangerousness that this would work, like, aren't we kind of back to means and balancing? Like, aren't we asking like the same kind of question that Bruin, ah, it's not on you. Your Honor, the answer is yes, absolutely, and that is part of why I think this whole idea of dangerousness is just not consistent with Bruin. It's a bankrupt concept because imagine, suppose Supreme Court says the test is dangerousness and we have to brief whether 922G1 satisfies that test. Think about what a brief, what briefs on that issue are going to look like. It's going to be both sides bringing in studies that say, you know, X percent of felons are violent. X percent of felons use guns to commit crimes. X percent of felons recidivate within 10 years. And then look at all that data and ask, could Congress reasonably conclude in light of all that data that felons as a class are dangerous? You're right, that is exactly the means and balancing that this Court did before Bruin. If you look at pre-Bruin cases like Statton or Chapman or Chester or Carter, it's the same analysis. It's functionally indistinguishable. Well, but I suppose Supreme Court could fall back on its assurance in Heller and in other cases that as a category felons simply are not the people, not considered to be among the people. Well, Your Honor, there's just no textual or historical basis for that. There may not be, but I suppose they can do whatever they want to do. No, that's true. They can do whatever they want. I think this Court, you know, to the extent it's going to decide the question of step one, needs to follow the holding of the Supreme Court's case law, which is that, quote, all Americans are among the people. And if the Supreme Court wants to later fashion some rule or explanation for why that's not the case, of course, as you said, they can do that. But I don't think anything in the holdings of the Supreme Court's cases support that. All right. Thank you. I see I'm well over time, so I will yield to my colleague. Thank you. May it please the Court, Your Honors. My name is Louis Lang. I represent, along with my co-counsel, Colin McBeth, Xavier in Canada. And the issue that I'm going to present to the Court in the next several minutes concerns the applicability of the ACCA 15-to-life sentence that my client was subject to at the time of both his first sentencing and his second sentencing. And that ACCA enhancement was based upon his conviction, three convictions, two for PWID in federal court and a third for a South Carolina offense, CDV 3rd. And CDV 3rd is simply the misdemeanor CDV committed twice and then you have a third time and it first enacted its CDV statute in 1984. It has remained unchanged since that time as to the misdemeanor aspect of it. And in that regard, Your Honor, I invite the Court's attention to simply the very words of that statute, and there are only 11 in all, and the statute prohibits or makes unlawful anyone causing physical harm or injury to a person's own household member. And I would suggest to the Court this is not a common law statute. It was, again, enacted in 1984. And the plain meaning of cause is simply to bring about an occasion or occasion something with or without intention. And that's a definition that I cite in my brief from the Oxford English Dictionary. And in that regard, Your Honor, I would suggest to the Court that that encompasses both intentional conduct and reckless conduct. Well, is that as a matter of, I mean, is that a theoretical possibility or is it in practice? I mean, are you aware of any case where the State has prosecuted someone for something less than intentional conduct under the statute? I'm not aware of any case in all candor, Your Honor. Isn't that what we need to look at? Well, that's one thing you need to look at, but I would suggest to the Court that this being a misdemeanor, and again, this is a misdemeanor statute, a misdemeanor type of punishment, and most of these cases, in fact the vast majority of cases, are prosecuted not in courts of record in South Carolina, but rather in Magistrate's Court, which is not a court of record, and which never get to the appellate process or up to the appellate level. And when you get to the appellate level in these cases, there are not the CDV misdemeanor cases in which my client was convicted, but rather the CDV first, second, and CDV hand, which is CDV of a high and aggravated nature. And those are the cases that are prosecuted. So that is a difficult part of my argument in all candor, Your Honor, but it is one that I would suggest to the Court that, again, most of these cases are prosecuted in Magistrate's Court, and therefore they will never get to an appellate court or even a circuit court to determine just that kind of question or to answer that kind of question. So no, I have no case, reported case, but I would suggest there just aren't that many, or aren't any, frankly. And, Your Honor, getting back to the word cause, what the government seeks to do is to limit that cause and that word to mean only intentional conduct. And I would suggest to the Court that that is not what our legislature intended when it passed its first CDV statute in 1984, and continue to adjust and amend the CDV structure of statutes, both civil and criminal, over the course of time up and through 2015. And in that regard, I would invite the Court's attention to Judge Floyd's dissent in Drummond, which is the published opinion that addresses the CDV statute but not the scienter necessary to commit that offense. And Judge Floyd, again, talking about South Carolina law, observes that South Carolina statutes involving CDV are remedial statutes. In other words, we have this design in South Carolina with the hope that we would be able to, we being the state, be able to intervene and to adjust and to remediate those sorts of, I see my time is about up, but I'll do my best to finish up, remediate those kinds of activities and those kinds of events that occur in a household among domestic partners. And South Carolina is one of the worst states that we have in this union involving criminal domestic violence incidences. And again, what the state, what the government seeks to do is narrow that down to just intentional conduct. And I would suggest to the Court, again, that that is not what the state intended, what the legislature intended, when it used the statute to cause physical harm. I see my time is up. Thank you very much. Ms. Stoughton. May it please the Court, I'm Katie Stoughton on behalf of the United States. Mr. Canada's conviction and sentence as an armed career criminal should be affirmed. With the Court's permission, I'd like to just very briefly address the domestic violence issue before we dive into Bruin. We would encourage the Court to defer to the South Carolina Supreme Court's decision that's forthcoming in the Clemens case. The issue in Clemens is criminal domestic violence of a high and aggravated nature and not criminal domestic violence itself. But the parties in that case have agreed that C.D.B. Hann turns on what the mens rea for the underlying domestic violence crime is. So, assuming that the Court answers the question that it's heard argument on now twice and that it's accepted certification on, it will resolve the issue that's in this case. If this Court rejects Mr. Canada's challenge to his conviction, he's in no danger of over-serving even if Clemens goes his way. He's either facing a 15-year mandatory minimum and a 220-month sentence or, by my calculation under the current version of the guidelines, a bottom of the guideline range of 97 months. So, there is no harm in this Court deferring to the South Carolina Supreme Court's decision in Clemens, especially after having recognized in the certification order that this Court would be unable to predict with confidence how that Court is going to rule on the issue. So, we would ask the Court, should it reach the issue, to wait and defer to the South Carolina Supreme Court's decision in that case. Turning to Mr. Canada's challenge to his conviction, the Court need not reach the Bruin claim because it's barred by the mandate rule. Should the Court deny his invitation to be the first appellate court in the country to find that there can be no constitutional application of 922G1? Can I ask you the question that I previewed that I was going to ask you? So, imagine Bruin was literally United States versus Bruin. Imagine that Bruin literally held this statute is facially unconstitutional. So under Griffin versus Kentucky, that holding is retroactive to cases still on direct appeal. How, is the government's view that even then he would still lose or is the government's view that that person would win this case somehow, that this individual doesn't win this case and explain to me how we do that? I'm not sure I completely tracked the second part of the question. So, it is this case in every respect except the respect that Bruin holds this statute is facially unconstitutional. So, then he goes back to the district court and he says, you cannot re-sentence me for anything because I was convicted of a non-crime. The Supreme Court has held 922G is a non-crime. I know what the Fourth Circuit said, you should re-sentence me, but there is a threshold problem, which is that I now stand convicted of a non-crime. Would the government of the view the mandate rule would bar the district court from recognizing that it's now a non-crime? So, without respect to the mandate rule, I mean, we certainly would agree that Rule 52 would govern. So, it was a... Sure, but that dude can satisfy plain air immediately. He's going to win under the plain air statute. I mean, just as a matter of, I mean, just basic equity and prosecutorial discretion, I can't imagine a case where we would say, no, absolutely not, he's bound because... But the mandate rule is not a matter of equity. The mandate rule is a matter of what the district court has the legal authority to do. How would the district court, in your view, have the legal authority to do that? Well, I don't know, honestly, that it would. I don't believe that the exceptions would apply if he hadn't previously in some way challenged... How does that not eviscerate Griffin, which says it applies retroactively to cases still in direct appeal. This dude's case is still in direct appeal. Well, I think I'm just as confused as the court is about how the mandate rule interacts with Rule 52, but I do want to assure the court, even if, in a case like that, even if we were to argue on remand, and I can't imagine that we would, that that claim would still be barred by the mandate rule, there are other avenues for securing relief from that conviction. And so it's... 2255. Certainly a claim that could be raised in a 2255. That person's going to win on 2255? I'm sorry? That person's going to win on 2255? Well, we would not... In this hypothetical world where this statute is facially unconstitutional, that person's going to win their 2255 petition. Absolutely. And just like the 924C cases, where 924C is based on attempted Hobbs Act robbery or Hobbs Act conspiracy, we've not contested relief on those 2255s. If the Supreme Court has made it clear that a conviction is absolutely invalid or unconstitutional, we're not continuing to defend those convictions. The problem here is that no court has said 922G1 is facially unconstitutional. Bruin certainly did not say that 922G1 is facially unconstitutional. Mr. Canada never raised a challenge to the constitutionality of his prosecution under G1 prior to the remand, which was solely to remedy an error in pronouncing the term of supervised release. Do you think the mandate rule, assuming, you know, the other procedural hurdles that Judge Hytens talked about can be satisfied, do you think the mandate rule is that narrow, that there I don't think there has to be a case directly on point. So some of the parameters that this court has set forth, for example, in the Newport case, it said recalibrating the lens that the court is looking through is sufficient in that case, but in that case. Why doesn't Bruin satisfy that? Because the issue in that case was that the district court was reconsidering a decision it had previously made based on an intervening change in the law from the Supreme Court. Here, you don't have any prior decision that's addressed the constitutionality of 922 G1. And so we may be in a different situation had Mr. Canada unsuccessfully raised an as-applied challenge prior to his trial or before his sentencing or before his first appeal. You know, maybe Bruin has at least recalibrated under the Brown standard, but here there's no prior decision. There is nothing that undermines or rejects the principal legal reasoning behind any of the court's prior decisions, which were totally unrelated to the case. Because we're applying the mandate rule, usually right when we apply the mandate rule, we're applying it to a decision made by the appellate court. That's not how it's working here. We're applying it to a decision that nobody ever made. So by definition, like the intervening case law can't be related to the reason for the mandate. You're basically saying that when we apply the mandate rule to a waived or forfeited issue, we get rid of that second exception. Intervening case law doesn't matter because by definition, it's not going to bear on an issue that was raised or discussed by the district court or the appellate court. Right? We're saying this falls within the mandate rule because the defendant forfeited his Bruin claim. So kind of by definition, there's not going to be any intervening... Well, where the court has... You're basically saying the second exception doesn't apply in this context. I don't think so. Well, in this context, where a claim hasn't been raised at all previously. Right. That's what I'm saying. The second exception goes away, in your view, when we are applying the mandate rule because an issue was waived, not because it was decided by the appellate court and sent back. So in the only four cases where the court has found the exception applies, they have all been undermined, either this court's or the district court's actual decision. Or a prior decision that was made. Right. I understand the logic behind what you're saying, but it does come down to that second exception. It just doesn't apply when we apply the mandate rule to a waived or forfeited issue. It doesn't allow, in Pleggy's words, the accident of a remand to allow a party to raise an issue that wasn't raised or could have been raised in a prior proceeding. This is such a mess. It does seem, for the same reason it struck Judge Heitens as bizarre that the defendant would get out of plain error review through the fortuity of a successful sentencing appeal, it does strike me as somewhat odd that we wouldn't even be able to review this for plain error. Because usually, if you forfeit an issue, we can still review it for plain error. So why can't we do that here? Well, I think because as the mandate rule as a law of the case doctrine is sort of, it's farther down the road than what we're normally thinking of in that context. But we can forgive the appellate, the failure to raise it on the first appeal. Just assume for a minute, I think, hypothetically, I think the failure to raise it on the first appeal is something that we would forgive under our appellate waiver doctrine. Because there was an intervening decision that made available an argument that was not heretofore reasonably available. What we can't forgive is the district court forfeiture. We can only review that for plain error. But we can review it for plain error. So I'm just, I don't understand why the fact that he won on a sentencing issue and we're back on a second appeal means he can't at least get the benefit of plain error review. Because the mandate rule laid to rest every issue that was not within the scope of the mandate. And that included, in Mr. Canada's case, the validity of his conviction. And so he doesn't get to use the fact that it was remanded for a re-sentencing to open the door to any other challenge based on a potentially beneficial intervening change in the law. So it's different than a case that's for the first time on direct appeal. If the defendant hadn't raised a claim for the district court and then there was an intervening decision, this court could forgive that. It would be forfeited and it would be reviewed So can I ask you then, just the implication of that argument first, is that when the district court considered the merits of his Second Amendment argument, the district court was actually doing something affirmatively wrong? We argued in the district court that it should not be considered. I'm not saying that's, okay, so then can I ask you, so another way I've tried to think about this, and I think it may suggest consistent with something you've said before, I sort of thought of the example of a civil case where we reversed a liability, sorry, we reversed a damages judgment on the grounds that the plaintiff's damages expert was improperly admitted under Rule 702. So there was a verdict on liability and a verdict on damages and this court concluded on appeal, we have to vacate the damages award because the plaintiff's damages expert violated Rule 702. And then the case goes back down to the district court and the plaintiff says, cool, let's start the trial over. And what the district judge would say is, what are you talking about? The Fourth Circuit didn't disturb the liability determination. They disturbed the damages amount. What you get is a new proceeding on damages. And look, at that point you can raise any arguments about damages you want to, including arguments you didn't make during the first trial because this is a new trial on damages. And so the analogy here would be to say, and this to me is how Kennedy makes sense, which is to say, when we send a case back for resentencing, of course the district court in conducting that resentencing has to follow our current best understanding of the law in sentencing, but that doesn't mean we reopen the trial, right? So this is complicated by the fact that this gentleman pleaded guilty, but I'm trying to imagine a world in which we vacate and remand for resentencing after a jury trial and then the defendant says, I'd like to point out there was a Crawford violation during my trial. We would say, you can't do that. We didn't reopen the validity of the verdict. We opened the validity of the, does that work? The sort of buckets like, when we think about what we do when we reverse is that we reopen a portion of what the trial court did, and of course when the trial court goes forward and redoes those things again, the things they do going forward have to comply with current law, regardless of whether they were raised before. But that doesn't mean we reopen things that sort of go back further in time. Does that make sense and does that strike you as right? I absolutely agree with the framework. I just would point out that Mr. Kennedy actually did go to trial. I'm sorry. This wasn't a guilty plea. My mistake. I don't know that it affects the analysis for purposes of this case, but. Well, but the analogy is if he was trying to say now there was a hearsay violation at my trial, we wouldn't say you can reopen whether there was evidence admitted in violation of Rule 801. Absolutely. I mean, the first appeal laid to rest everything other than his sentence, which was sent back to the district court. That was all that remained open when the case was remanded, excuse me, was the sentence. And it was a de novo resentencing and he could raise any argument he wanted to, to support the sentence that he wished the district court would impose. Including arguments he didn't make the first time around. Absolutely. Yes. That did not give him license, though, to challenge the underlying conviction. If the court doesn't have any further questions about the mandate rule, I'm happy to move on to the merits of the Bruin challenge. I just would like to start by noting that Mr. Kennedy has the burden, because he's brought a facial challenge, of establishing that there is no set of circumstances under which the felon possession ban would be valid. We believe the sources in our brief show a history and tradition of legislatures making categorical judgments disarming groups based on the untenable risk of danger that they pose to society if armed. And in this case, Mr. Kennedy's own violent criminal history shows that at the very least, he poses a potential danger to society if armed. This case is a constitutional application of 922G1, which is why perhaps he's never raised an as-applied challenge at all. You don't need to go any farther than Mr. Kennedy himself. His criminal history includes convictions for failure to stop for a blue light, three criminal domestic violence convictions involving two different significant others, and conduct like punching, slapping, and striking them. He's got multiple state drug convictions, two federal PWID convictions, a prior conviction for being a felon in possession of a firearm, and a prior conviction for using a firearm during a drug trafficking offense. In March of 2020, while he was in custody following his arrest for the instant offense, he wrote a letter threatening to gun a man down for telling on him and getting him caught up again. And he wrote that he's preoccupied with killing and hurting, and death is the only cure for betrayal in his eyes. By Mr. Kennedy's own admission, and of course as his criminal history reflects, he is a constant and continuous threat to public safety. And so when we are analogizing to founding era legislatures disarming people who they believe to be dangerous, at the very least that includes people like Mr. Kennedy, and the statute is not facially unconstitutional. At the first step of the Bruin analysis, the question for the court to ask is whether the plain text of the Second Amendment covers the regulated conduct, which of course here is possession of firearms by felons. We've made two independent arguments as to why the answer to that question is no. The first relies on this court's pre-Bruin precedent, which we believe remains binding. In those cases, relying on Heller, the court held that conviction of a felony necessarily removes one from the class of law-abiding, responsible citizens to whom the Second Amendment extends, and possession of firearms by felons is outside the Second Amendment's scope. Nothing in Bruin's overturning of the second step of the post-Heller-Chester analysis undermines the decisions that this court previously made at the first step of the analysis. That case law remains binding, and the court need go no farther than that. Our second independent argument is that felons do not fall within the meaning of the people under the Second Amendment. As to the court's pre-Bruin precedent, I just want to underscore that Bruin provides no reason for reconsidering it. Moore, Smoot, Pruess, Carpio-Leone, Hamilton, those were all cases decided at the first step of the post-Heller analysis. The question the court asked then is the same as it asks after Bruin, and that's whether the challenged law burdens conduct that falls within the Second Amendment's guarantee as it was understood at the time of the ratification. This court took Heller's language, announcing that the Second Amendment protects the core right of law-abiding, responsible citizens to use arms in defense of hearth and home. This court said that imposes a law-abiding, responsible citizen requirement. It used that word requirement repeatedly in those opinions that I just cited, and nothing in Bruin undermines that. Bruin is not a contrary, superseding decision that would allow this court to hold that those cases are no longer valid. It didn't overrule their reasoning. There are 14 times in the majority opinion alone that it references the rights of law-abiding citizens, and so we believe the court's holding that law-abiding, responsible citizens either fall outside of the amendment scope as an initial matter or that they can lawfully be stripped of their Second Amendment rights based on their status as non-law-abiding, responsible citizens. Either way, that case law is still good. Counsel, can I ask you a question about that? You just gave a whole string site of all of our sort of post-Heller pre-Bruin cases, but the only one we would really have to reach in this case, right, is the question of whether Moore survives. Yes. Right, because Pruess, you don't need in this case, so the sort of narrowest way to address the case in front of us probably, or I guess the question, do you agree, would be just to say that the Moore case rejecting a facial challenge to 922G is not abrogated by Bruin. Yes. And with respect to the Moore case, Moore did rely, of course, on Heller's presumptively lawful language. And explaining what that language might mean, it said it could mean that the felon possession ban was historically understood to be a valid limitation on the Second Amendment right, or it could mean that the possession ban regulates conduct that fully falls outside the scope of the Second Amendment. It said whichever the Supreme Court met, it's sufficient to negate a 922G1 challenge. Mr. Canada is arguing that the court should not have relied on the presumptively lawful language, that it should have done a full analysis into history and text and common understanding of the text of the Second Amendment at the time of ratification. A different panel may have done that, but the fact remains that Moore did rely on the presumptively lawful language, and nothing in Bruin undermines its analysis at that first step. Bruin said it was reiterating Heller's standard, that it was in keeping with Heller, and that it was applying the test set forth in Heller. And so we argue that Moore in particular, but that that entire line of cases, as well as Carpio Leon, which was dealing with a different statute, but also reached the conclusion based on an analysis of the history, that non-law abiding responsible citizens are outside the scope of the Second Amendment. Those are all still good case law after Bruin. I'm happy to go to the second step of the analysis and address the historical analogs. We don't think it's necessary for the court to go there because of the mandate rule, because of its prior precedent. But with my time waning, I'm happy to answer any questions that the court may have. Thank you very much. Rest on our breasts. Thank you. Mr. McBeth. Thank you, Your Honor. Just two, maybe three very quick points. First is as to Moore, it's true that Moore did not rely on means and balancing, but it did rely on another part of Heller that Bruin abrogated, and that is deferring to the victim about presumptively lawful regulatory measures. Bruin addressed a law that fit within one of those measures, bans on concealed carry. And rather than just accepting that Heller had decided that question already, the court went ahead and did a full exhaustive historical analysis. So if that's true for concealed carry bans, it should be true for felon and possession laws as well. And that's the part of Moore that we think Bruin has abrogated. This whole case gives me a headache, but let me ask you a question about that. Just when we think about whether we are bound by prior panel precedent, like it is a very high threshold to say that our precedent has been abrogated by the Supreme Court, and it does strike me that sort of the Supreme Court is free in Bruin to say like, oh, you know, what we said presumptively lawful, but we might want to revisit part of that. In a way, the Supreme Court has a little more running room there than we do when we're trying to figure out if we're bound by Moore. Does that make any sense? Yes, it does. I guess the way I look at it is this. Suppose Moore had never been decided, pre-Bruin this court had never addressed 922G1. Then Bruin issued, and the first challenge to 922G1 came along. This court said, well, we're going to just say the statute is constitutional because Heller says it's presumptively lawful. I think that analysis would be totally inconsistent with Bruin, given that Bruin says two things. One, the only way you uphold the statute is text and history, and two, specifically with regard to these presumptively lawful regulatory measures from Heller, we don't just defer to that. We do the text and history analysis. Whatever the standard is in different cases from this court articulated differently, whether it's inconsistent or untenable or whatever it is, I think Moore fails that test because there's just no way you can reconcile his reflexive deference to dicta with what the Bruin court did, which is take one of those measures and subject it to exhaustive, quite thorough analysis. So I think this court's precedent in Moore fails regardless of how the court articulates the test, but I understand the point you're making, Your Honor. The second thing is I just want to say, with regards to this law-abiding responsible citizen standard, that it's incredibly vague, it's incredibly malleable, nobody knows what it means, the government has never suggested what it means, and it can't possibly be a limitation on a fundamental enumerated right if it gives legislatures the power to disarm essentially anyone they want by deeming anything illegal. The court in Harrison, the Oklahoma case that we cited, gave an example of, well, if New York wanted to get around Bruin, it could simply make it a crime to mill your lawn, and then every time someone mowed their lawn, they could take their gun away because that person is not law-abiding, and that can't possibly be right, especially when, again, that issue of law-abiding citizens was not an issue in Bruin, and the court did not decide it, and the holdings of the feller make clear that all Americans have Second Amendment rights. So unless the court has any more time, I will stop there, or any more questions, I'm sorry. Thank you. Senator McBeth. Very briefly, Your Honors, I certainly am hopeful that our Supreme Court will answer the question of the mens rea required to commit CDV in the Clemens, United States v. Clemens case, which is presently before it. I had hoped that they would have done that already, but they haven't, and I certainly submit that this court will be bound if they do actually answer that question. If they do not, I would suggest to the court again that CDV can be committed by reckless conduct and not the very narrow conduct of intentional conduct that the government would suggest to the court is necessary to establish a violation of our criminal domestic violence law in South Carolina. Again, unless the court has any questions, thank you very much. I appreciate it. Thank you, Mr. Plank. Thank counsel for their helpful arguments this morning, and what is a confounding case in many ways. We'll come down and greet you all, and then move on to our second case.
judges: Albert Diaz, Pamela A. Harris, Toby J. Heytens